'Booth, Chief Justice,
delivered the opinion:
The Delaware Tribe of Indians sue for the value of certain lands alleged to have been included in their reservation by the terms of certain treaties made with them in 1818 and 1829. The suit is brought under a special jurisdictional act passed February 7, 1925 (43 Stat. 812), as amended by the act of March 3, 1927 (44 Stat. 1358), viz:
“ That all claims of whatsoever nature the Delaware Tribe of Indians residing in Oklahoma may have or claim to have against the United States may be submitted to the Court of Claims, with right of appeal to the Supreme Court of the United States by either party; and jurisdiction is hereby conferred upon the said Court of Claims and the said Supreme Court of the United States to hear, determine, and enter judgment on any and all such claims. The said courts shall consider all such claims de novo, upon a legal- and equitable basis, and without regard to any decision, finding, or settlement heretofore had in respect of any such claims.
“ If any claim or claims be submitted to said courts, they shall settle the rights therein, both legal and equitable, of each and all parties thereto, notwithstanding lapse of time or statutes of limitation, ana any payment which may have been made upon any claim so submitted shall not be pleaded as an estoppel, but may be pleaded as an offset in such suits or actions. The claim or claims of said Delaware Tribe may be presented separately or jointly by petition, subject, however, to amendment, and the petition shall be verified by the attorney or attorneys employed by such Delaware Tribe under contract approved by the Secretary of the Interior and the Commissioner of Indian Affairs in accordance with sections 2103 to 2105 of the United States Revised Statutes to prosecute their claims under this act. Official letters, *540 papers, records, documents, and public records, or certificate copies thereof, may be used in evidence; and tbe departments of the Government shall give access to the attorney or attorneys of such Delaware Tribe to copies of such treaties, papers, correspondence, and records as may be needed by the said attorney or attorneys.
“Upon the final determination of any suit, the Court of Claims shall decree such fees as may be deemed fair and reasonable for services and expenses rendered and incurred therein, to be paid to the attorney or attorneys, such fees for services not to exceed 10 per centum on the amount of the judgments recovered, and in no event to be more than $25,000 in any one claim, and the Court of Claims shall also decree to the estate of Richard C. Adams, deceased member of the Delaware Tribe, and its representative and attorney for many years and up to his death in October, 1921, a reasonable amount for the services and expenses of said Richard C. Adams, rendered and incurred during his lifetime for and on behalf of said Delaware Tribe in connection with its claims against the United States, to the extent of but in no event to exceed 2% per centum on any sums recovered ; and all of such sums so to be paid for services and expenses shall be paid out of any sum or sums found due said Delaware Tribe and not otherwise. Such suit, suits, or causes shall be advanced on the docket of the Court of Claims and by the Supreme Court of the United States if an appeal shall be taken.”
The above acts are clearly intended to confer plenary jurisdiction upon this court to adjudicate the controversies which the plaintiff Indians have for a long time had with the Government over tribal rights and tribal lands emanating from treaties or acts of Congress. The single issue involved in this case — which is to be tried de novo — arises out of a survey made in pursuance of a Senate resolution ratifying a treaty made with the plaintiff Indians on September 24, 1829 (I Stat. 327). The Delaware Indians were removed from the State of Indiana to a reservation west of the Mississippi River by the treaty of October 3, 1818 (7 Stat. 188), and occupied until 1829 a country upon the James’ Fork of the White River in the State of Missouri. By the terms of the treaty of September 24, 1829, the plaintiff Indians ceded their reservation established by the treaty of October 3, 1818, and agreed to accept in lieu thereof a reservation described in the treaty of 1829 as follows:
*541 “ * * * that the country in the fork of the Kansas and Missouri Rivers, extending up the Kansas River to the Kansas line, and up the Missouri River to Camp Leavenworth, and thence by a line drawn westwardly, leaving a space ten miles wide, north of the Kansas boundary line, for an outlet; shall be conveyed and forever secured by the United States, to the said Delaware Nation, as their permanent residence: And the United States hereby pledges the faith of the Government to guarantee to the said Delaware Nation forever the quiet and peaceable possession and undisturbed enjoyment of the same, against the claims and assaults of all and every other people whatever.”
When the treaty of 1829 came before the Senate it was ratified by the following Senate resolution (May 29, 1830, Senate Executive Journal, vol. 4, p. 120) :
“ Resolved {two-thirds of the Senators present concurring) , That the Senate do advise and consent to the ratification of the supplementary article, concluded at council camp, on James' Fork of White River, in the State of Missouri, the 24th day of September, 1829, to a treaty between the United States and the Delaware Indians, made the 3d day of October, 1818: Provided, That the President of the United States, with all convenient dispatch, employ a surveyor, at the usual rate of compensation for like services, to run the lines of the country by the foregoing treaty granted to the said Delaware Nation of Indians, to establish certain and notorious landmarks, accurately and permanently to distinguish the boundaries of the said granted country and of the said outlet reserved in the treaty; that the said surveyor run the lines and fix and establish the boundaries of the said granted country and the said outlet in the presence of an agent to be designated by the Delaware Nation; and that it shall be the duty of the said surveyor to report to the President of the United States his proceedings in the premises, together with a map or draught of the said granted country and the said outlet; and that when the President shall be satisfied that the said proceedings had been concurred in and approved of by the agent of the said Delaware Nation, he shall also approve of the same by his signature and seal of office, and cause one copy of the same to be affiled among the archives of the Government, and one copy to be delivered to the agent of the Delaware Nation, for the use of the said nation, and which shall be thereafter binding and conclusive upon the respective parties to the foregoing treaty.”
*542 On May 29, 1830, Isaac McCoy, a surveyor, was regularly appointed to make the survey of the reservation created by the treaty of 1829, and made acquainted with the terms and conditions of the Senate resolution under which the same was to be made. The resolution of the Senate specifically pointed out and provided for a reservation of fixed and permanent boundaries and in addition to entrusting the task of surveying in accord with its terms to an experienced and competent surveyor, exacted approval of his work by a selected agent of the plaintiff Indians and the President before it became effective. McCoy did survey and run the lines of the country set aside to the plaintiff Indians in the treaty of 1829. During the course of his work he was accompanied by Captain John Quick, “ an aged and respectable man, and second chief of the tribe,” duly designated by the tribe to act for them and remaining with the surveyor until recalled by the tribe at a time when the survey was practically completed. Captain Quick approved the survey made by McCoy, pointed out in his detail report the extent of his personal observations, and among other things said: “ With its boundaries as shown to me, and as exhibited on a map, both agreeing, I am perfectly satisfied knowing them to be precisely as required by the treaty by which we obtained a claim to this land.”
On February 11, 1831, President Jackson issued his proclamation approving the survey made by McCoy, and the plaintiff Indians, anxious and willing to occupy the lands, moved thereon. The treaty of 1829 fixed in a general description the boundaries of the reservation erected by its terms. Manifestly the description of boundaries therein contained exacted a survey precise and accurate, so as to segregate the reservation for all time from the great body of public lands out of which it was to be carved. Camp Leavenworth was designated in the treaty of 1829 as the northern boundary of the reservation by the following provision : “ The country in the fork of the Kansas and Missouri Fiver, extending up the Kansas Fiver, to the Kansas line, and up the Missouri Fiver to Camp Leavenworth.” When McCoy, the surveyor, reached the site of Camp Leav *543 enworth be found, a body of soldiers occupying an undetermined and unsurveyed area of land, in or about the center of which a flagpole flying the American- flag had been erected, whereupon he determined that the necessities of the camp required a tract of land “ six miles on the Missouri River and four miles back should be secured for this object,” and in accord with his determination surveyed and fixed the northern boundary of the plaintiff Indians’ reservation. This suit is predicated upon this act of Surveyor McCoy, the plaintiff Indians alleging that McCoy was not authorized by the treaty of 1829 or the resolution of the Senate ratifying the same to survey or fix the boundaries of Camp Leavenworth, and, as we comprehend it, an insistence that the designation of Camp Leavenworth as the northern boundary of the reservation implied no more than a mere identification of an unsurveyed site limited to the area in actual occupation by the soldiers. The flagpole of the camp, it is contended, should have at least marked the northern boundary of the reservation, for the reservation described in the treaty of 1829 was not in anywise subject to diminution in area by taking out of it a site for a permanent military camp or cantonment. If the plaintiffs’ contention is sustainable and the surveyor was without authority in the premises, undoubtedly the area of land, the value of which is sued for herein, was included in plaintiffs’ reservation by the treaty of 1829. Camp Leavenworth was established under proper military orders March 7, 1827, two years before the treaty of 1829 was entered into. At the time of its establishment the lands upon which Colonel Leavenworth was to locate his regiment were described with all the accuracy it was possible to give to unsurveyed lands of the United States. All that could be done at the time was to identify by such definite description as the locality afforded the point where the military forces should be established. Neither in 1827 nor 1829 did the Government or the War Department know precisely how many acres of land the camp would require, and all that seemingly was known was that a military camp had been established at the point where McCoy found it and that it was of sufficient importance to the Government in making the treaty of 1829 that the reservation therein *544 erected should not include the site of the camp. We say this because the northern boundary of the reservation of 1829 was only to extend to Camp Leavenworth. When the surveyor reached the site of Camp Leavenworth he was charged with fixing the northern boundary of the Indian reservation. No terms of the treaty, no official survey of the camp, no instructions, were available directing him what to do, and even admitting that he was without authority to set aside by a survey a site for a camp, he was without a doubt vested with authority to fix the northern boundary of the Indian reservation at the camp, subject of course to ratification and approval by the Indians’ agent and the President of the United States. The treaty said the reservation was to extend “ to Camp Leavenworth” Surely the surveyor, in the absence of positive knowledge as to the extent of Camp Leavenworth, was authorized to at least determine what under all the circumstances was in his judgment the south line of the camp. It is difficult to hold that he should have chosen the flagpole as the monument which marked the point where the area of the camp began and the Indian reservation terminated. The report of the surveyor indicates no hasty determination, no arbitrary exercise of authority, no prejudice against the Indians, but rather the exercise of a deliberation and consultation with both the Indians’ agent and the commandant of the camp before concluding as he did conclude. Aside from all this, however, the resolution of the Senate ratifying the treaty of 1829 provided in express terms that when the report of the surveyor, approved by the designated Indian agent, was finally approved by the President it “ shall be thereafter binding and conclusive upon the respective parties to the foregoing treaty.” The report was received by the President, approved by him, and the Indian tribe acquiesced in its terms by removing upon the reservation before the survey was entirely completed.
It is true that in 1889 and again in 1854 a resurvey of Camp Leavenworth was made, and it is likewise established that the lands eliminated by the resurveys from the original area of the camp were sold and the proceeds derived therefrom paid fo the plaintiff Indians. The above facts, con *545 fidently relied upon to establish error in McCoy’s survey, fail we think to serve such a purpose. In the first place, McCoy’s southern boundary as surveyed by him was not disturbed, the area eliminated was upon the western boundary, and there is nothing in the record to warrant a holding that the resurveys áctually made were so made to correct obvious errors theretofore made in 1829. Ten years and twenty-five years in the development and settlement of the West constitute sufficient periods of time to work radical changes in the surveys of public domain made at preceding dates and especially so with reference to the Government’s policy in its relationship with tribal Indians and tribal Indian lands. As the finding show, acts were passed authorizing the organization of territories and it became imperative to definitely and permanently fix the lines and limitations of Government lands reserved for military or other purposes, so that they might be withheld from public settlement or sale, and we think we are precluded from determining that what was done in 1839 and 1854 is positive proof of a lack of Government confirmation of what was done with respect to the Indian reservation carved out of the public domain by the treaty of 1829.
So far as we are able to discern from the conceded facts, trying the case de novo, the treaty of 1829 as ratified by the Senate in 1830 was observed in every particular by the Government and the Government’s agenfs authorized to act, and acquiesced in and approved by the Indians as the ratifying resolution of the Senate provided.
The petition will be dismissed. It is so ordered.
Whaley, Judge; Williams, Judge; LittletoN, Judge; and GeeeN, Judge, concur.